UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF LOUISIANA

WAYNE BARNETT, JR. C.A. NO.: 3:17-CV-153-JWD-EWD

VERSUS

NATIONAL CONTINENTAL INSURANCE
COMPANY, SONIC EXPRESS, LLC AND
DELFIN DEGUZMAN

## RULING ON DEFENDANTS' MOTION TO EXCLUDE TESTIMONY OF DR. CHARLES KAUFMAN

Before the Court is Defendants' Motion to Exclude Testimony of Dr. Charles Kaufman (Doc. 42), by National Continental Insurance Company ("National"), Sonic Express, LLC, ("Sonic") and Delfin Deguzman ("Deguzman") ("collectively "Defendants"). Plaintiff Wayne Barnett, Jr. ("Barnett" or "Plaintiff") opposes the motion. (Doc. 51.) For the following reasons, the motion is denied.

## BACKGROUND AND ARGUMENTS OF THE PARTIES

This case arises out of a motor vehicle collision between Plaintiff and Deguzman, who, at the time of the collision, is alleged to have been working for Sonic. National is alleged to insure Sonic and Deguzman. Liability and damages are contested. Pertinent to this motion is the extent of injuries and damages suffered by Plaintiff. Plaintiff alleges that he suffered mild traumatic brain injury ("TBI"). (Doc. 51 at 1-2.) In support of his contention, Plaintiff offers the testimony of treating neurologist Charles Kaufman, M.D.

Defendants argue that Kaufman's testimony should be excluded because his conclusion that Plaintiff's alleged brain injury was caused by the accident is not properly supported under the principles announced in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

1

Specifically, Defendants insist that his causation opinion is "unreliable, based on insufficient facts, data and expertise." (Doc. 42-1 at 1.)

Defendants contend that Kaufman's conclusion that Plaintiff suffered TBI is not sufficiently supported because, in part, it is based on an inaccurate history given by Plaintiff. (*Id*. at 4.) Defendants argue that Kaufman "relied solely" on Barnett's history that he struck his head during the accident to support his finding that there was a "significant enough force or velocity experienced by his body…to result in a brain injury." (*Id*. at 4-5.) But, argue Defendants, Plaintiff "did not strike his head during the accident." (*Id*., at 4.)

In addition, Kaufman doesn't know the speed of the vehicles, "admittedly has no training in biomechanics" (Doc. 42-1 at 5) and thus, "fatal to his attempt to offer an opinion regarding causation[,]… does not know the change in velocity required for a concussion…" (*Id*.) Next, Defendant criticizes Kaufman's testing (specifically, the NeuroTrax cognitive study and the Diffusion Tensor Imaging ("DTI" studies) because neither can date the onset of the brain injury. Because Barnett suffered a concussion when he was a young teenager and a collision with an embankment in 2015, "Kaufman cannot conclusively link Mr. Barnett's alleged traumatic brain injury with the accident" in question. (*Id*., at 8.) He also questions the reliability of these "controversial" tests. (*Id.,* at 9.)

Plaintiff responds first by challenging Defendants' understanding of the facts of the accident and specifically Defendants' "repeated <u>false assertion</u>…that Mr. Barnett did not strike his head." (Doc. 51 at 6, emphasis in original.) "Mr. Barnett specifically testified in his deposition that he struck his head on the rearview mirror of his vehicle, knocking the mirror off his windshield, and resulting in numerous cuts to his face." (*Id*., at 6., citing Doc. 51-2 at 3-4.) Further, argues Plaintiff, one can suffer a concussion from a "acceleration/deceleration

2

movement (i.e. whiplash)" which can cause TBI. (*Id*., at 6-7, citing medical articles, n. 17, which are attached as Docs. 51-9 and 51-10)

Plaintiff also defends Kaufman's testing. DTI "has been tested and has a low error rate, been subject[ed] to peer review and publication…and…is a generally accepted method for detecting TBI." *Andrew v. Patterson Motor Freight, Inc*., 2014 WL 5449732 (W.D. La. Oct. 23, 2014 at * 8-9) (Doherty, J) (citations omitted) (rejecting Daubert challenge to DTI related testimony) .

More generally, Plaintiff maintains that a physician's use of his patient's history, clinical findings, testing, medical literature and his experience is the normal and accepted methodology used to support medical opinions on causation. (Doc. 51 at 8-9.) He argues that Defendants' insistence that such an opinion must be supported by biomechanical expertise and analysis is incorrect and unsupported by any case law. (*Id*., at 9.)

## **STANDARD**

This purports to be a *Daubert* challenge based on the expert's alleged failure to use an accepted methodology as well as the opinion's alleged lack of an adequate and correct factual foundation. (Doc. 42 at 1-2, citing *Daubert v. Merrell Dow Pharmaceuticals, Inc*. 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)). When *Daubert* is invoked, a district court may, but is not required, to hold a hearing at which the proffered opinion may be challenged. *Carlson v. Bioremedi Therapeutic Sys., Inc*., 822 F.3d 194, 201 (5th Cir. 2016). However, when no hearing is held, "a district court must still perform its gatekeeping function by performing some type of *Daubert* inquiry." *Id*. "At a minimum, a district court must create a record of its *Daubert* inquiry and 'articulate its basis for admitting expert testimony.'" *Id.* (quoting *Rodriquez v. Riddell Sports, Inc.,* 242 F.3d 567, 581 (5th Cir. 2001)).

The role of the trial court is to serve as the gatekeeper for expert testimony by making the determination of whether the expert opinion is reliable. As the Fifth Circuit has held:

> [W]hen expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case. *Daubert* went on to make "general observations" intended to guide a district court's evaluation of scientific evidence. The nonexclusive list includes "whether [a theory or technique] can be (and has been) tested," whether it "has been subjected to peer review and publication," the "known or potential rate of error," and the "existence and maintenance of standards controlling the technique's operation," as well as "general acceptance." The Court summarized:
>
>> The inquiry envisioned by Rule 702 is, we emphasize, a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability-of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988–89 (5th Cir. 1997) (citations omitted).

The cases following *Daubert* have expanded the factors and explained the listing is neither all-encompassing nor is every factor required in every case. *See, e.g.*, *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997); *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). Indeed, courts may look to other factors. *Joiner*, 522 U.S. at 146.

This Court has explained:

> The admissibility of expert testimony is governed by Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, which provide that the court serves as a gatekeeper, ensuring all scientific testimony is relevant and reliable. This gatekeeping role extends to all expert testimony, whether scientific or not. Under Rule 702, the court must consider three primary requirements in determining the admissibility of expert testimony: 1) qualifications of the expert witness; 2) relevance of the testimony; and 3) reliability of the principles and methodology upon which the testimony is based.

*Fayard v. Tire Kingdom, Inc.*, No. 09-171, 2010 WL 3999011, at *1, 2010 U.S. Dist. LEXIS 108845, at *2-3 (M.D. La. Oct. 12, 2010) (citations omitted) (relying on *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147, 119 S. Ct. 1167, 1174 (1999)).

The Court has broad discretion in deciding whether to admit expert opinion testimony. *See, e.g.*, *Joiner*, 522 U.S. at 138-39 (holding that appellate courts review a trial court's decision to admit or exclude expert testimony under *Daubert* under the abuse of discretion standard); *Carlson*, 822 F.3d at 199 (same); *Hidden Oaks Ltd. v. City of Austin*, 138 F.3d 1036, 1050 (5th Cir. 1998) ("Trial courts have 'wide discretion' in deciding whether or not a particular witness qualifies as an expert under the Federal Rules of Evidence."); *Watkins v. Telsmith, Inc.*, 121 F.3d 984, 988 (5th Cir. 1997) (holding "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony").

"Notwithstanding *Daubert*, the Court remains cognizant that 'the rejection of expert testimony is the exception and not the rule.'" *Johnson v. Samsung Elecs. Am., Inc.*, 277 F.R.D. 161, 165 (E.D. La. 2011) (citing Fed. R. Evid. 702 Advisory Committee Note (2000 amend.)). Further, as explained in *Scordill v. Louisville Ladder Grp., L.L.C.*, No. 02-2565, 2003 WL 22427981, 2003 U.S. Dist. LEXIS 19052 (E.D. La. Oct. 24, 2003) (Vance, J.):

> The Court notes that its role as a gatekeeper does not replace the traditional adversary system and the place of the jury within the system. As the *Daubert* Court noted, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." The Fifth Circuit has added that, in determining the admissibility of expert testimony, a district court must defer to "'the jury's role as the proper arbiter of disputes between conflicting opinions. As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility and should be left for the jury's consideration.'"

*Id.* at *3 (citations omitted) (relying on, among others, *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987), and *United States v. 14.38 Acres of Land, More or Less Sit. In Leflore County, Miss.*, 80 F.3d 1074, 1077 (5th Cir. 1996) (quoting *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987))).

The Supreme Court has recognized that not all expert opinion testimony can be measured by the same exact standard. Rather, the *Daubert* analysis is a "flexible" one, and "the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise and the subject of his testimony." *Kumho*, 526 U.S. at 150.

In that vein, the Fifth Circuit has concluded that "soft sciences" involve "necessarily diminished methodological precision" when compared to other scientific disciplines like mathematics and engineering. *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006) (citing and quoting *Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287 (8th Cir. 1997)).

> In such instances, other indicia of reliability are considered under *Daubert*, including professional experience, education, training, and observations. Because there are areas of expertise, such as the "social sciences in which the research theories and opinions cannot have the exactness of hard science methodologies", . . . trial judges are given broad discretion to determine "whether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case."

*Id.* (citations omitted) (relying on *Kumho Tire Co.*, 526 U.S. at 153 and *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002)).

## **APPLICATION**

First, Defendants do not challenge Kaufman's expertise as a neurologist. The Court has reviewed his curriculum vitae (Doc. 42-14) and finds him to be highly qualified. Dr. Kaufman received his B.S. and M.D. degrees from Louisiana State University. He completed his residency in neurology at LSU Medical Center and then finished a neurophysiology fellowship at Harvard Medical School. Kaufman then taught at both Harvard Medical School and Brown University after which he served as Chief of Neurology at St. Joseph's Hospital in Providence, Rhode Island. He then returned to private practice in Baton Rouge, La.

The Court has carefully reviewed both the affidavit and the report of Dr. Kaufman and find his opinions to be well supported using the standard methodology of a treating physician. Treating doctors are routinely permitted to opine regarding the patient's injuries and disability that they form during the course of treatment. *See, e.g., Cohen v. Lockwood,* No. 02-2246, 2004 WL 763961 at *3 (D. Kan. April 8, 2004); *Zanowic v. Ashcroft*, No. 97 Civ. 5292, 52 Fed. R. Serv. 3d 702, 2002 WL 373229 at *3 (S.D.N.Y. Mar. 8, 2002) (treating physician "can express an opinion as to 'the cause of any medical condition presented in a patient, the diagnosis, the prognosis and the extent of any disability, if any, caused by the injury." (quoting *Shapardon v. West Beach Estates*, 172 F.R.D. 415, 416-17 (D. Haw. 1997)). *See also*, *Maxwell v. Becker*, No. 12 CV 00864, 2015 WL 4872137 at *3 (W.D.N.Y. Aug. 13, 2015); *Ortega v. Chater*, 933 F. Supp. 1071, 1074-75 (S.D. Fla. 1996.) Generally, "the accepted diagnostic tool of examination accompanied by physical history as related by the patient' is sufficient for an expert witness doctor to testify as to causation." *Rivera v. U*.S., No. 15-cv-00021, 2017 WL 3393464 at *3 (W.D. Tex. Feb. 21, 2017) (quoting *Thomas v. G&K Servs. Co.*, No. 01-1637, 2002 WL 34720493, at *1 (E.D. La. Aug. 16, 2002) (*citing Cooper v. Carl A. Nelson & Co.*, 2011 F.3d 1008, 1020-21, (7th Cir. 2000).)

This is what Dr. Kaufman has done here, plus more. He utilized the patient's history and complaints in combination with examinations, clinical and radiologic testing, treatment, and referrals to other specialists. In addition, he did research of medical literature and utilized his considerable education, training and experience as a neurologist to reach his conclusions. In his Affidavit, Dr. Kaufman explains in meticulous detail what he did and how he reached his conclusions. (*See* Doc. 51-7, particularly ¶¶ 6 and 7.)

Contrary to the suggestion by Defendants, there is no requirement that a neurologist also have expertise in bio-mechanical engineering or accident reconstruction in order to opine as to the nature and cause of his patient's brain injury. Defendants have pointed this Court to no authority for such a proposition. Dr. Kaufman says it well in his affidavit:

> "A mathematical quantification of the forces experienced by a patient's brain are very rarely available to a medical doctor and the use of such information is not generally accepted within the medical community as a basis for the diagnosis of a concussion. Rather, the manner in which a patient's brain reacts to a given event, as described in paragraph 6 above, is the standard within the medical community by which a concussion is diagnosed." (Doc. 51-7 at 3, ¶ 8.)

Defendants argue that Kaufman's opinion is tainted because he relied on Barnett's history of direct trauma to his head when, in fact there was no direct injury. (Doc. 42-1 at 4 ("…Mr. Barnett did not strike his head during this accident…").) Defendants' contention is mystifying and troubling in as much as Barnett clearly testified in deposition that his head and face struck the rear-view mirror so hard that he knocked it off and suffered lacerations to the face in the process. (Doc. 51-2 at 3-4.) Dr. Kaufman's initial report records the facial lacerations as part of his history taken from Barnett. (Doc. 51-3 at 1.)

Defendants complain that "Dr. Kaufman apparently ruled out two events from Mr. Barnett's history that could have caused his current symptoms: the concussion when he was a young teenager, and a collision with an embankment that occurred…a year before the [subject accident]." (Doc. 42-1 at 8.) It is clear from Dr. Kaufman's report and affidavit that he was made aware of these two events by Barnett and considered but rejected these in reaching his opinion that the subject accident caused the TBI. *See, e.g.,* Doc. 51-7 at ¶ 10.

Whether a medical causation expert reviewed a plaintiff's medical history is important in considering the reliability of his opinion and "failure to consider and exclude other potential causes of [a plaintiff's] injury before offering an opinion renders [medical causation expert]

8

testimony unreliable." *McNabney v. Lab. Corp. of Am.*, 153 Fed. Appx. 293, 295 (5th Cir. 2005). However, "a patient's oral history is generally considered reliable." *Rivera v. United States.*, No. 15-cv-00021, 2017 WL 3393464 at *3 (W.D. Tex. Feb. 21, 2017) (quoting *Viterbo v. Dow Chem. Co*., 826 F.2d 420, 423 (5th Cir. 1987). Furthermore, *McNabney* does not require the expert to conduct "an exhaustive search that forces [the] expert 'to disprove[] or discredit[] every possible cause other than the one espoused by him'; but, an expert must be aware of the plaintiff's pertinent medical history." *McNabney*, 54 Fed. Appx. at 295 (quoting *Viterbo*, 826 F.2d at 424). *See also, Rivera* at *4; *Fos v. Wal-Mart Stores East, LP*, No. 3:12cv735, 2015 WL 11117924 at *5 (S.D. Miss. June 2, 2015); *Charles v. Sanchez*, No.13-cv-00193, 2015 WL 808417 at *5 (W.D. Tex. Feb. 24, 2015).

Defendants argue that neither the NeuroTrax nor the DTI testing can identify the time period when the TBI occurred and thus Dr. Kaufman has no basis upon which to tie the TBI to the subject accident. (Doc. 42-1 at 1.) But this assumes that these two tests were the only bases upon which Kaufman concluded that this accident caused Plaintiff's TBI. This assumption is a false one as is clear from Kaufman's report and affidavit.

Defendants' broader attack on Kaufman's reliance on DTI is simply unsupported. Furthermore, a host of other cases have specifically rejected *Daubert* challenges to the reliability of DTI. In *Andrew v. Patterson Motor Freight, Inc*., No. 6:13CV814, 2014 WL 5449732 at * 9 (W.D. La. Oct. 23, 2014), the court concluded, "[i]n sum, the evidence submitted shows DTI has been tested and has a low error rate; DTI has been subject to peer review and publication; and DTI is a generally accepted method for detecting TBI." (record citations omitted). *See also*, *Marsh v. Celebrity Cruises, Inc*., No. 1:17-cv-21097, 2017 WL 6987718 at *4 (S.D. Fla. Dec. 15, 2017); *Roach v. Hughes*, No. 4:13-CV-00136, 2016 WL 9560306 at *3 (W.D. Ky. Mar. 9 2016);

*White v. Deere & Co.,* No. 13-cv-02173, 2016 WL 462960 at *4 (D. Colo. Feb. 8, 2016); *Ruppel v. Kucanin*, No. 3:08 CV 591, 2011 WL 2470621 at *6-11 (N.D. Ind. June 20, 2011); *Booth v. Kit*, *Inc.*, Civ. No. 06-1219, 2009 WL 4544473 (D.N.M. Mar. 23, 2009).

## CONCLUSION

In sum, the Court finds that Dr. Kaufman's methodology in reaching his conclusions is sound and appropriate. Accordingly, Defendants' Motion to Exclude Testimony of Dr. Charles Kaufman (Doc. 42) is DENIED.

Signed in Baton Rouge, Louisiana on the 8th day of January, 2019.

_____
**JUDGE JOHN W. deGRAVELLES**
**UNITED STATES DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**